NOT DESIGNATED FOR PUBLICATION

No. 114,289

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIAM J. CHEEVER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Greenwood District Court; DAVID A. RICKE, judge. Opinion filed November 18, 2016. Affirmed.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., GREEN, J., and WILLIAM S. WOOLLEY, District Judge, assigned.

*Per Curiam*:  William J. Cheever was convicted for possession of methamphetamine, cultivation of marijuana, and illegal possession of a firearm. On appeal, Cheever contends that the district court erred by denying his motion for a mistrial, by instructing the jury in a way that impaired its right to nullification, and by the procedure used to calculate his criminal history. He also contends that the prosecutor committed error. In addition, he asserts that even if his individual contentions of error are not reversible, his convictions should be reversed based on cumulative error. For the reasons set forth in this opinion, we affirm Cheever's convictions and sentence.

1

FACTS

On the night of July 28, 2012, the Greenwood County Sheriff's Office received a call to assist in the search for a woman who was possibly suicidal. Edna Knox had last been seen at a house in Severy. Deputy Jason Myers and another officer went to the house—which belonged to Virginia Van Buskirk, Cheever's mother—and obtained permission to search the property for the missing woman. The record reflects that the property consisted of 10 acres upon which one house and two trailer houses were located.

While searching the property, the officers smelled marijuana and observed marijuana plants located near the house. According to the officers, the plants did not appear to be wild. Rather, they appeared to be well maintained. As a result, Deputy Myers decided to start watching the property in an attempt to determine who was maintaining the marijuana plants.

Because the plants were visible from the road, Deputy Myers began driving by the property three to four times a week to determine if they were being harvested. During the afternoon of October 2, 2012, Deputy Myers noticed a black Chevrolet Avalanche—similar to one that he believed Cheever drove—parked next to the marijuana plants. In addition, Deputy Myers noted that he could no longer see the tops of the plants. Accordingly, he believed this to be an indication the plants were harvested.

Later that day, Deputy Myers learned that Cheever had a subpoena in an unrelated matter and went to serve it on him at his mother's house around 5 p.m. While serving Cheever with the subpoena, Deputy Myers noticed that the marijuana plants appeared to have been cut recently. As such, he notified his office of his observations and requested that additional Sheriff's officers be sent to the scene. Deputy Myers continued to watch the property and observed Cheever and his then girlfriend, Dorothy King, enter the house.

2

At about 6 p.m., Reserve Deputy Randy Cox arrived and he went with Deputy Myers to the house. Deputy Myers and the other officer took Van Buskirk to show Cheever's mother the marijuana plants they observed on her property. Cheever followed them from the house and agreed with Deputy Myers that the plants appeared to be maintained.

Around 7 p.m., Cheever's mother gave the officers permission to search her property, including all structures, vehicles, and open land. During the search, the officers found a total of seven marijuana plants in the open area of the property, hidden away from obvious view from the road. The plants appeared to be well-maintained, with mulch under some of them. The officers also found remnants of a joint, marijuana seeds, rolling papers, and a soil PH tester in one of the trailer houses located on the property.

During the search, the officers also found a red pickup truck with its doors open. The pickup—which King later testified belonged to Cheever—was located about halfway between the marijuana plants and the trailer home. Inside the pickup truck, officers found the subpoena that Deputy Myers had served on him earlier in the day, a .22 caliber rifle with ammunition, and 88 plastic baggies. Later that night, Deputy Myers used a drug dog to sniff Cheever's black Chevrolet Avalanche, and the dog indicated the presence of something in the truck. Deputy Myers had the truck towed until a search warrant could be issued.

The next day, Deputy Myers and another officer interviewed King. She indicated that she used methamphetamine with Cheever in his Avalanche the previous afternoon. According to King, Cheever provided the methamphetamine that they used. She also told the officers that she and Cheever had snorted the drugs on the center console of the Avalanche. The officers then sought and obtained a search warrant for Cheever's truck.

3

On the morning of October 4, 2012, Deputy Myers met with King at her home. She told him that Cheever had been drying marijuana plants in a shed located on her property. King explained that she saw Cheever with about 1/2 pound of marijuana and that he had told her he had recently cut the marijuana plants on his mother's property. Additionally, she informed Deputy Myers that Cheever was also dealing and using methamphetamines regularly.

That night, Deputy Myers and other officers executed the search warrant on Cheever's black Chevrolet Avalanche. In the truck, he found methamphetamine, a blue tube with methamphetamine residue, rock cocaine, and a vehicle registration showing that Cheever and Knox jointly owned the vehicle.

On March 7, 2013, Cheever was charged with:

- one count of unlawful cultivation of marijuana, in violation of K.S.A. 2012 Supp. 21-5705(a)(4), a level 3 drug felony;
- one count of unlawful possession of marijuana, with intent to distribute, in violation of K.S.A. 2012 Supp. 21-5705(a)(4), a level 2 drug felony;
- one count of unlawful possession of a controlled substance, methamphetamine, in violation of K.S.A. 2012 Supp. 21-5706, a level 4 drug felony;
- one count of criminal possession of a firearm by a convicted felon, in violation of K.S.A. 2012 Supp. 21-6304(a)(1), a level 8 nonperson felony;
- one count of no tax stamp, in violation of K.S.A. 79-5204, a level 10 nonperson felony; and
- one count of unlawful possession of drug paraphernalia, in violation of K.S.A. 2012 Supp. 21-5709(b)(2), a class A nonperson misdemeanor.

4

Prior to trial, Cheever filed a motion to suppress evidence, a motion in limine, and a motion to dismiss the charges filed against him. On March 20, 2014, the district court held an evidentiary hearing on these motions. At the hearing, the State presented the testimony of Deputy Myers and Deputy Matt Clemon. In addition, the State presented the search warrant and supporting affidavit as evidence. After hearing the arguments and considering the evidence, the district court denied Cheever's motion to suppress evidence as a result of the officer's initial warrantless entry and search of Van Buskirk's property on October 2, 2012. The district court also denied Cheever's motion with regard to the search warrant issued for the Avalanche, finding the warrant to be legally and factually sufficient. Finally, the district court denied Cheever's motion to dismiss.

A 2-day jury trial began on September 9, 2014. Prior to trial, the State filed an amended complaint in which it dropped the charges of unlawful possession of marijuana with intent to distribute, no tax stamp, and drug paraphernalia. During the trial, the State presented the testimony of Deputy Myers. The State also admitted a number of photographs into evidence through Deputy Myers' testimony. In addition, the State presented the testimony a forensic scientist of the Kansas Bureau of Investigation (KBI)—who identified the methamphetamine and marijuana seized as evidence—as well as the testimony of Cheever's mother—who confirmed that she had given consent for the officers to search her property in October 2012. Cheever's mother also confirmed that Cheever and King would go to the area where the marijuana plants were growing.

In his defense, Cheever presented the testimony of King—who admitted that she smoked marijuana and used methamphetamine. King claimed that the gun and the blue tube that were found in Cheever's truck belonged to her. King testified that actually she was the one who offered Cheever methamphetamine. She also said she could not recall telling the officers about Cheever leaving her house with a 1/2 pound of marijuana. Finally, King testified that she was not aware of any marijuana growing on the property owned by Cheever's mother. In addition, Cheever called Van Buskirk's friend, who

5

stayed with her three to four times a week, as a witness who testified that he never saw Cheever or King cultivating any "suspicious looking vegetation."

At the conclusion of the trial, the jury found Cheever guilty for all three of the remaining charges. Subsequently, Cheever moved for a downward dispositional or durational departure. On January 23, 2015, the district court denied the departure motion and sentenced Cheever to 52 months of prison for unlawful cultivation of marijuana, 11 months prison—concurrent to count I—for unlawful possession of a controlled substance, and 7 months—consecutive to counts I and II—for criminal possession of a firearm.

ANALYSIS

*Motion for Mistrial*

On appeal, Cheever contends that the district court erred by denying his request for a mistrial. A court may declare a mistrial if prejudicial conduct, inside or outside the courtroom, makes it impossible to proceed without injustice to either the defendant or the prosecution. K.S.A. 22-3423(1)(c). In determining whether to grant a motion for a mistrial, a district court must first determine if the conduct has resulted in a fundamental failure in the proceeding. If so, the district court must then determine whether the trial can continue without an injustice. In other words, it must be determined if the damaging effect of the conduct can be removed or mitigated by an admonition, jury instruction, or other action by the district court. If not, it must be determined whether the degree of prejudice interferes with the right to a fair trial. *State v. Corey*, 304 Kan. 721, 730, 374 P.3d 654 (2016).

We review the district court's ruling on a motion for mistrial for abuse of discretion. Our inquiry is separated into two parts:  (1) Did the district court abuse its

6

discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the district court abuse its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction or other means, resulting in an injustice? 304 Kan. at 730. The fundamental failure analysis varies with the nature of the alleged deficiency, *i.e*., whether it is based on a witness' actions, a bystander's actions, prosecutorial error, or an evidentiary error. 304 Kan. at 731.

When determining if a fundamental failure made it impossible to proceed without injustice, a court must assess whether the failure affects a party's substantial rights—in other words, whether it will affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does not, the court will use the statutory harmless error standard of K.S.A. 2015 Supp. 60-261 and K.S.A. 60-2105. If it does, the court will use the constitutional harmless error analysis of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Corey*, 304 Kan. at 731.

"An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis . . . ." *State v. Ward*, 292 Kan. 541, 570, 256 P.3d 801 (2011). Put differently, our review is a harmlessness inquiry, even though abuse of discretion has been articulated as the nominal standard of review. *Corey*, 304 Kan. at 731. The level of certainty in the trial's outcome required under the nonconstitutional and constitutional harmless error tests are distinct. For nonconstitutional error, the trial court applies K.S.A. 2015 Supp. 60-261 and determines if there is a reasonable probability the error did or will affect the outcome of the trial in light of the entire record. But for constitutional error, the court applies the test articulated in *Chapman*, under which an error may be declared harmless only when it is demonstrated beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, *i.e*.,

7

when there is no reasonable possibility the error contributed to the verdict. Under either test, the party benefitting from the error bears the burden of demonstrating harmlessness. *Corey*, 304 Kan. at 731-32.

In the present case, Cheever sought a mistrial based on the actions of a juror. Following King's testimony, a juror informed the district court that she had previously supervised King's sister at work and had learned unfavorable information regarding King. Specifically, the juror learned:

> "Basically that she's not a very good mother. Katie [King's sister] is taking care of her children on numerous occasions, providing birthday things, presents, and such, and basically I'm familiar with Katie and her mother as well more so than this young lady basically Katie tried to drop out of the family because of her sister and her mother."

The district court admonished the juror that she was "to only consider [King's] testimony based on your observations in the courtroom." The court then asked the juror whether she could be fair and impartial, and the following exchange took place:

> "[JUROR]: I'm not certain, because what I know of the other family members is that they tend to be dishonest.

> "THE COURT: Again, the fairness issue is not necessarily toward a witness but rather the parties in the case?

> "[JUROR]: Right.

> "THE COURT: So the question is, number one, you would be asked to not share any outside information with the other jurors, and number two, I would ask you just disregard that when you have to weigh all the evidence in the case when you're discussing this case with the other jurors.

> "[JUROR]: Okay.

8

"THE COURT: Do you think you can do that?

"[JUROR]: Yes.

"THE COURT: And you believe that you can still be fair to the interest of the State of Kansas in this case?

"[JUROR]: Yes, sir.

"THE COURT: And you can be fair to the interests of Mr. Cheever who is the defendant in this case?

"[JUROR]: Yes, because I don't know Mr. Cheever.

"THE COURT: And, again, the Court will be admonishing you here not to share any outside information or things you may have learned. I think you perhaps even accurately stated this is hearsay.

"Hearsay is almost considered by the Court system to be inherently unreliable with certain exceptions so I think that you already know that this isn't really based on firsthand knowledge or your own first-hand observations but rather stuff you've heard; and, frankly, a lot of people know things about a lot of people who testify at court, things they've heard about Law Enforcement Officers over time or a department in general or perhaps the prosecuting attorney, but they set that aside and they base their decision solely on what's presented in court, and that's what I wanted to check with you.

"Can you base your ultimate decision in conjunction with the other jurors based on the admissible evidence in court and if you think you can?

"[JUROR]: Yes."

Although defense counsel asked for a mistrial, the motion was denied. The district court reasoned that the juror stated that she could be fair and impartial to both Cheever

9

and the State. She also indicated that her ultimate decision would be based on the admissible evidence. In addition, the district court noted that neither party had inquired into whether any potential juror may have known the witness during voir dire.

Cheever contends that the juror's initial response regarding King proves the juror had a bias against him. As a result, he argues that it was error to allow the juror to remain. In response, the State contends that we should focus on the juror's ultimate responses—where she agreed that she could be fair and impartial—rather than simply looking to her initial answer.

Ordinarily, jury misconduct occurs when a jury considers matters completely outside the evidence presented in the case. *State v. Leaper*, 291 Kan. 89, Syl. ¶ 4, 238 P.3d 266 (2010.) Juror misconduct will not be a ground for mistrial, however, unless the party claiming error shows that such error substantially prejudiced his or her rights. *State v. Wimbley*, 271 Kan. 843, 852, 26 P.3d 657 (2001.) We find no substantial prejudice in this case.

Here, Cheever offers no argument as to why we should replace our judgment for that of the district court that had the opportunity to personally observe the juror as she promised to fairly and impartially decide the case based solely on the evidence admitted at trial. Moreover, there is nothing in the record to indicate that the juror violated her oath or promises. Likewise, there is nothing in the record to indicate that she shared her impressions of King with other jurors. Furthermore, the district court took reasonable steps to remove or mitigate any damaging effect by its admonitions to the juror. Thus, we find that the district court did not abuse its discretion in how it handled this matter or in determining that Cheever could receive a fair trial and that the trial could proceed to verdict.

10

*Jury Nullification Instruction*

Next, Cheever contends that the jury instructions given by the district court negated the jury's right of nullification. Specifically, Cheever takes issue with Instruction 2, which is modeled after PIK Crim. 4th 51.010. The instruction states: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find the defendant guilty." Because Cheever did not object to the instruction, we review this issue under a clearly erroneous standard. K.S.A. 2015 Supp. 22-3414(3); *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013).

When determining whether an instruction is clearly erroneous, this court engages in a two-step analysis. First, the court considers whether any error occurred, which requires employing an unlimited review of the entire record to determine whether the instruction was legally and factually appropriate. Second, if the court finds error, it must assess whether it is firmly convinced that the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014). The party claiming that an instruction was clearly erroneous has the burden to establish the degree of prejudice necessary for reversal. *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 4, 5, 286 P.3d 195 (2012).

Numerous opinions of this court have rejected Cheever's argument. See *State v. Allen*, 52 Kan. App. 2d 729, 733-36, 372 P.3d 432 (2016); *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at *1-2 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* May 23, 2016; *State v. Hastings*, No. 112,222, 2016 WL 852857, at *4-5 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* April 1, 2016; *State v. Singleton*, No. 112,997, 2016 WL 368083, at *4-6 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* February 26, 2016; *State v. Jones*, No. 111,386, 2015 WL 4716235, at *5-6 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1080 (2016). Similar to this case, the defendants in those cases also argued that the word *should* compelled the

11

jury to convict, contravening other cases that disapproved of imperatives like *must* or *will.* However, we have consistently found that the instruction at issue here "'does not upset the balance between encouraging jury nullification and forbidding it. . . . [U]nlike the words must, shall, and will, the word should does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path.' *Hastings*, 2016 WL 852857, at *4." *Allen*, 52 Kan. App. 2d at 735. Thus, we conclude that the district court did not error in instructing the jury.

*Prosecutorial Error*

Cheever also contends that certain statements made by the prosecutor during voir dire and during closing arguments constituted prosecutorial error. Recently, the Kansas Supreme Court modified the standard of review for prosecutorial error in *State v. Sherman*, 305 Kan.___, 378 P.3d 1060, 1075 (2016). Under *Sherman*, we are to follow "a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice." 305 Kan. ___, Syl. ¶ 6.

In *Sherman*, our Supreme Court held:

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the

12

verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' *State v. Sprague*, 303 Kan. 418, 430, 362 P.3d 828 (2015)." 378 P.3d at 1075.

Prior to *Sherman*, we were required to determine issues of prosecutorial error or misconduct by a two-step process: (1) whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence, and, if so, (2) whether the statements constitute plain error. *State v. Stevenson*, 297 Kan. 49, 51, 298 P.3d 303 (2013). To determine plain error, courts were required to consider three factors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will by the prosecutor; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have little weight with the jury. *State v. Brinklow*, 288 Kan. 39, 44, 200 P.3d 1225 (2009).

Here, Cheever first takes issue with the following statement made by the prosecutor in voir dire:

"The thing that I want to make sure that we're clear on is when the judge instructs you on the law, as a juror, *you're going to need to follow that law*. So if the law says you know if you find that this person possessed or cultivated marijuana, it shouldn't matter what side of the debate a person is on, if you find the facts, that the defendant was indeed cultivating marijuana in Greenwood County, Kansas; do you have a problem with that?" (Emphasis added).

Cheever contends that that the prosecutor acted improperly in suggesting to the jury during voir dire that it should follow the law. Specifically, he argues that in doing so the prosecutor foreclosed the jury's power of nullification. We, however, find such a statement to be a correct statement of law and well within the wide latitude given to

13

prosecutors. See *Cuellar*, 2016 WL 1614037, at *2-3; *State v. Burton*, No. 112,990, 2015 WL 3031227, at *3 (Kan. App. 2015) (unpublished opinion), *petition for rev. filed* June 27, 2016. Although it is true that jurors have a right to nullification, it is indeed their duty to follow the law as given to them by the court.

Cheever further alleges the prosecutor committed error during closing arguments. Specifically, Cheever complains about the following argument:

"So also in regards to the elements of intentionally, this was done on purpose. This was not an accidental thing. There was no situation I would submit that makes any sense at all about somebody flicking out seeds and then magically marijuana plants appear.

"I'm familiar with that story. I've read that story. It involves a beanstalk and a boy named Jack. That's not what happened here. These plants were cared for."

Cheever also takes issue with the prosecutor's discussion about King's motives to "craft" her statements around the evidence and the statement that her testimony would put her "in the legal hotseat." Cheever characterized these statements as equivalent to calling King dishonest. The State responds that these arguments were permissible discussions on the credibility of competing stories. The State argues it was encouraging the jury to make permissible inferences on King's credibility and the feasibility of her story.

A prosecutor may not express personal opinions about the credibility or reliability of a witness. *State v. Todd*, 299 Kan. 263, 283, 323 P.3d 263 (2014). But a prosecutor may offer the jury an explanation of what it should look for in assessing witness credibility. There is a distinction between such proper argument and its improper twin, argument on the prosecutor's personal belief or opinion about a witness' credibility. A prosecutor does not commit misconduct when arguing witness credibility based on reasonable inferences from the evidence presented at trial. Moreover, "'Kansas courts

14

have consistently held that "[e]xposing bias or motive for testifying is a proper subject for cross-examination," and, "by extension, the prosecutor is free to argue this point to the jury if the evidence has established the facts."'" 299 Kan. at 283.

Cheever cites *State v. Elnicki*, 279 Kan. 47, 62-64, 105 P.3d 1222 (2005), as an example of a prosecutor going outside his or her wide latitude. In that case, the prosecutor referred to the defendant's version of events as a "'yarn,'" "'fairy tale,'" "'fabrication,'" "'tall tale,'" and "'spin,'" for a total of 11 times. 279 Kan. at 58-60. Although the *Elnicki* court found that the prosecutor went too far, it recognized that some commentary on the veracity of a witness—such as describing motive and means to "fabricate lies"—may be appropriate. 279 Kan. at 61 (citing *State v. Finley*, 273 Kan. 237, 246-47, 42 P.3d 273 [2002]). The *Elnicki* court also noted that describing why a story was not feasible is appropriate. 279 Kan. at 61 (quoting *State v. Moore*, 274 Kan. 639, 646, 55 P.3d 903 (2002).

Keeping in mind the wide latitude given to prosecutors to explain to juries what they should look for in assessing the credibility of witnesses, we do not find the argument made in this case to rise to the level of either prosecutorial misconduct under the pre-*Sherman* standard or prosecutorial error under the *Sherman* standard. With the circumstances presented, we find that it was reasonable for the prosecutor to address King's motive for changing the story she had previously told law enforcement officers. Moreover, although we do not endorse the words used by the prosecutor, we do not find them to rise to the level of prosecutorial error or misconduct. Furthermore, even if we found the statements to be error, based on the evidence presented at trial regarding the investigation and physical evidence, we find that there is no reasonable possibility that the error contributed to the verdict.

*Cumulative Error*

Next, Cheever contends that cumulative errors require a reversal of his convictions. The test for cumulative error is "'whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant.'" *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014). Here, however, we have not found any error. Thus, we do not find Cheever's argument regarding cumulative error to be persuasive.

*Calculation of Sentence*

Finally, Cheever contends that the district court erred in calculating his criminal history score. Specifically, he argues that the use of his criminal history to calculate his guidelines sentence was unconstitutional since his past convictions were not proved in this case to a jury. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Our Supreme Court has rejected this argument, and we reject it as well. See *State v. Baker*, 297 Kan. 482, 485, 301 P.3d 706 (2013); *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002).

Affirmed.